**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JONATHAN MICHAEL KANTNER,** | : | **Civil No. 3:21-CV-309** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security**[1] | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM OPINION</u>**

**I.     <u>Introduction</u>**

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see,</u>

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

> e.g., <u>Perales</u>, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. <u>See</u> <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

Jonathan Kantner, a convicted pedophile, applied for disability and supplemental security income under Titles II and XVI of the Social Security Act on April 3, 2019, alleging an onset date of January 13, 2016. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Kantner was not disabled but could perform a range of work with some limitations, including the limitation that he cannot have contact with minors.[2] Kantner now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, we find that

---

[2] In 2016, Kantner pleaded guilty to several state charges after he inappropriately touched two minor children at the school where he worked as a teacher's aide. <u>See</u> <u>Commonwealth v. Kantner</u>, CP-38-CR-0000488-2016; CP-38-CR-0000675-2016. He served nine months in prison, after which he served a term of parole that included the condition that he not have direct contact with minor children.

substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   Statement of Facts and of the Case

Kantner filed his claim for disability benefits on April 3, 2019. On September 1, 2020, Kantner appeared telephonically before an ALJ, alleging an onset date of January 13, 2016. (Tr. 12). Kantner alleged disability due to unspecified schizophrenia. (Tr. 194). He was thirty years old at his alleged onset date, had a college education, and had past work as a teacher and a teacher's aide. (Tr. 21, 195).

In January of 2016, Kantner was involuntarily committed to Good Samaritan Hospital due to an increase in delusional thinking and paranoia. (Tr. 282). His father had reported that Kantner was afraid his wife was trying to poison him and that he refused to eat. (Id.) At this time, Kantner reported hearing voices. (Id.) He was transferred to Philhaven for treatment. (Id.)

Upon his arrival at Philhaven, Kantner was given an intake screening, where it was noted that he was very confused and that he believed his wife was poisoning him. (Tr. 631). He reported that he was staying with his father because his wife and in-laws were not treating him well. (Id.) It was noted that he had no suicidal or homicidal thoughts, but that he was depressed, irritable, paranoid, and anxious, and that his memory was impaired. (Tr. 641-42). Kantner was eventually discharged on

January 27, 2016, and it was noted that upon discharge, he had an appropriate affect and euthymic mood, no hallucinations, and no thoughts of self-harm or harm to others. (Tr. 622).

Kantner was involuntarily committed again on November 10, 2016. (Tr. 271). His father had reported Kantner had become more withdrawn and psychotic, in that Kantner had been standing in the middle of traffic telling people to vote for Jesus, and he voted for Jesus in the presidential election. (Tr. 269-71). It was reported that Kantner slept all day, that he was paranoid and was hearing voices, and that he had not been taking his medications since June. (Tr. 269). Kantner's father also reported that Kantner had made threats to harm him. (Tr. 707). Ultimately, Kantner was discharged on November 29, 2016 with a full range of affect and a "good" mood. (Tr. 709). He denied any psychotic symptoms or hallucinations, and his sleep and appetite had improved. (Id.)

Treatment notes from Philhaven outpatient services indicate that Kantner was incarcerated the day after he was discharged from inpatient treatment and was released in September of 2017. (Tr. 314). Following his release from prison, he was seen at Philhaven for an evaluation. (Tr. 316-19). It was noted at that time that Kantner had no suicidal or homicidal ideations, auditory or visual hallucinations, or

4

any symptoms of psychosis. (Tr. 316). It was further noted that Kantner was seeking employment opportunities upon his release from prison. (Tr. 317).

Kantner treated at Renaissance for counseling services following his period of incarceration. (Tr. 756-818). A recurring theme of these counseling sessions was Kantner's depression stemming from the separation with his ex-wife. (Id.) Treatment notes from September 25, 2017 indicate that Kantner was willing to comply with his treatment requirements, and one of his goals was to apply for employment at McDonald's. (Tr. 810-11). In October, it was noted that the separation from his wife was affecting him, and the therapist worked with him to identify stages of grief and how to reframe his negative thoughts. (Tr. 804). Treatment notes also indicate that at this time, Kantner was suffering from moderate depression but was working on his coping skills, obtaining a job, and addressing the depression from the separation with his wife. (Tr. 800). In December, his therapist noted that he continued to be fixated on the past relationship with his ex-wife, which was causing a cycle of depression. (Tr. 784).

In February of 2018, treatment notes from Renaissance indicated that Kantner was still having thoughts of depression related to his ex-wife. (Tr. 764). However, it was noted that he did not present a risk of suicidal or homicidal ideation. (Tr. 765).

While he made some progress during treatment, Kantner chose to end treatment at Renaissance in March of 2018. (Tr. 756).

Around this time, Kantner was also receiving outpatient psychiatric treatment at Philhaven. A treatment note from May of 2018 shows that Kantner's mood, appetite, and sleep were all good, and that he had no anxiety. (Tr. 1043). He had no suicidal or homicidal ideation, had good memory and adequate concentration, and had non-psychotic thought processes. (Tr. 1044). Kantner reported feeling stable on his medications at that time. (Id.) In June, Kantner's evaluation was about the same, although he reported feeling tired. (Tr. 1039). In August and September, it was again noted that Kantner had good memory and adequate concentration, non-psychotic thoughts, no suicidal or homicidal ideation, and no anxiety but had a flat affect. (Tr. 1028, 1034).

In November of 2018 and January of 2019, treatment notes indicated that his psychosis and mood were stable, but that he had low motivation and energy. (Tr. 1019, 1024). A note in February 2019 indicated that Kantner's fatigue may have been because he was off one of his medications, although Kantner reported compliance with his medications. (Tr. 1011-12). In April 2019, it was noted that Kantner had no complaints of low energy or feeling tired. (Tr. 1006). Additionally, an assessment in July indicated that Kantner's father contradicted Kantner's belief

that everything was good, reporting that Kantner was fatigued and irritable. (Tr. 1001). Another treatment note from July indicated that Kantner was actively looking for work and was looking for jobs that did not require background checks. (Tr. 982). In August of 2019, treatment notes indicate that Kantner's depression was improving while his psychosis remained stable. (Tr. 996-97).

Kantner was evaluated by a state agency psychologist in July 2019. (Tr. 56-60). Kantner was found to have a moderate limitation in the following areas: maintaining attention and concentration for extended periods; his ability to complete a normal work week without interruptions from psychological symptoms; interacting with the general public; accepting instructions and responding appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and setting realistic goals or make plans independently. (Tr. 59-60). The state agency psychologist opined that Kantner was capable of understanding, retaining, and following simple instructions; making simple decisions; and performing simple, routine, repetitive tasks in a stable environment. (Tr. 60).

Philhaven treatment notes from September of 2019 noted that Kantner was feeling more depressed due to his divorce and being unable to see his daughter. (Tr. 364). At this time, it was reported that Kantner had a girlfriend, but that he was "kind of" depressed, even while taking Zoloft. (Tr. 365). In October, it was noted that

Kantner had been attempting to contact his ex-wife, after which she called the police. (Tr. 363). A mental status evaluation in December 2019 revealed that Kantner had normal speech and thought processes, was cooperative, but he was sad and lonely and missed his ex-wife. (Tr. 399). He reported receiving a cease-and-desist letter from an attorney regarding his attempts to contact his ex-wife. (Tr. 400). His therapist encouraged him to join a church choir if his parole allowed it. (Id.) Additionally, at this time, it was noted that his "[f]ather wants him to go on disability." (Tr. 394). However, it was recommended that Kantner explore employment options, such as a Spanish interpreter, warehouse or factory jobs, or a gas station attendant. (Tr. 396). Additionally, Kantner was advised that he, not his father, should call colleges to inquire about obtaining a certificate in interpreting. (Id.)

In January of 2020, Kantner was evaluated by a second state agency psychologist. (Tr. 77-81). This psychologist opined that Kantner had the ability to make simple decisions, could maintain regular attendance and be punctual, and was able to carry out short, simple, instructions. (Tr. 80). He further opined that Kantner could perform simple, routine tasks in a stable environment. (Tr. 81).

Kantner continued treatment at Philhaven in January of 2020. It was noted that Kantner did not want to give the name of his parole officer or authorize a release

8

at that time. (Tr. 1087). In February, a mental status evaluation indicated that his speech and thought processes were normal, he was cooperative and had appropriate affect but was depressed. (Tr. 1083). He expressed no homicidal or suicidal ideation. (Id.) It was noted at this time that he was doing better after his Zoloft was increased, and he was applying for jobs but "[h]is father is pushing for SSDI and doesn't feel he'll ever work again." (Tr. 1081). Kantner was encouraged to look for factory and warehouse jobs where he would have no contact with minors and was again encouraged to look into getting an interpreter certificate. (Id.) Kantner's father was similarly encouraged to allow Kantner to work on his issues. (Id.)

In March of 2020, it was noted that Kantner was experiencing suicidal ideation. (Tr. 1077). He was working on getting a job, but he had been denied a job at a gas station because of his criminal record. (Tr. 1078). In May, a mental status evaluation revealed normal speech and thought processes, normal insight, limited judgment, and no suicidal ideations, homicidal ideations, hallucinations, or delusions. (Tr. 1074-75).

It is against this medical backdrop that the ALJ held a telephonic hearing on Kantner's disability claim on September 1, 2020.  (Tr. 27-48). At the hearing, both Kantner and a Vocational Expert testified. (Id.) By a decision dated September 14, 2020, the ALJ denied Kantner's application for benefits. (Tr. 9-26).

In that decision, the ALJ first concluded that Kantner had not engaged in any substantial gainful activity from the alleged onset date of January 13, 2016. (Tr. 14). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Kantner had the following severe impairments: schizophrenia, spectrum disorder with psychotic disorder, depression, and pedophilic disorder. (Id.) The ALJ also found that Kantner had a number of nonsevere impairments, as these impairments did not exist for a continuous period of twelve months, were responsive to medication, did not require significant medical treatment, or did not result in continuous functional limitations. (Tr. 15). At Step 3, the ALJ determined that Kantner did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 15-16).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering Kantner's limitations from his impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant cannot have any occupation that requires the individual to have a smart phone, use the internet or interact directly with minors. The claimant is limited to simple routine repetitive tasks with few if any workplace changes, no interaction with the public, and occasional supervision.

(Tr. 16).

10

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Kantner's testimony regarding his impairments. The ALJ noted Kantner's history of inpatient psychiatric treatment in 2016, but that since then his mental impairments had significantly improved. (Tr. 18). Mental status evaluations following his release from prison in September 2017 revealed he had normal thought processes and no psychotic thought processes, he was oriented to person, place, and time, and he denied suicidal or homicidal ideations. (Id.) The ALJ noted that Kantner was discharged from PA Counseling Services in 2018 with improvement and completion of the treatment. (Id.) Throughout 2019, the ALJ noted, Kantner reported no psychosis while taking his medications, and he had good concentration and memory. (Id.) He was still feeling depressed, so he was prescribed Zoloft in December of 2019. (Id.) The ALJ further noted that at this time, treatment notes indicated Kantner's father wanted him on disability and seemed to be contradicting Kantner. (Id.) Treatment notes from January of 2020 indicated that Kantner was still feeling depressed due to the separation from his wife. (Id.)

On this score, the ALJ noted:

The record supports that with therapy and medication, the claimant has improved, which is noted in the medical records showing that the claimant is much improved since his inpatient psychiatric stay. The claimant is able to function on his own as the claimant reported that his

father is gone most of the time and the claimant and his father noted the claimant is capable of performing his own personal care, chores around the home, preparing simple meals and shopping in stores. The claimant indicates he has not had suicidal ideation for years and even then he did not have a plan. While the record does show two episodes of significant mental illness and inpatient hospitalization in 2016 at the beginning of the period at issue, these decompensations correlate with the claimant's cessation of mental health treatment and medication. Subsequent to these hospitalizations and incarceration the claimant has been stable with medication treatment and therapy. The claimant testified that he is unable to work due to deficits in motivation and energy, and the claimant did relate to his treating physicians some indication of sedation in the morning due to his medications, however the claimant's medications were changed and the records do not show consistent complaints of this. Additionally, there is some indication that the claimant's father has been pursuing disability for his son and contradicting his claims. There is also an indication that the claimant was pursuing employment but was denied due to his criminal history. Though the claimant continues to experience situational and personal stressors and has some limitations in mental functioning due to residual depression, there is no indication that the claimant would be unable to perform simple routine repetitive tasks with few if any workplace changes as he is able to read, play video games, perform chores, care for himself, grocery shop and attend doctor visits cooperatively. Additionally he is consistently noted to have normal attention and concentration as well as intact remote and recent memory with average to above average intelligence. Additionally, the undersigned has limited the claimant to no interaction with the public, and occasional supervision as a result of his pedophilic disorder and anxiety as noted above.

(Tr. 19) (citations omitted).

The ALJ also considered the medical opinion evidence in this case. Thus, the ALJ considered the opinion of Johnny Patterson, CRNP, which was rendered in January of 2019. (Tr. 20). CRNP Patterson opined that Kantner was unable to work

12

due to medication changes and the way his medications affected his ability to engage in full time work, but that Kantner could possibly return to work in about nine months. (Id.) The ALJ reasoned that CRNP Patterson opined on the ultimate issue in the case, and thus found his opinion unpersuasive. (Id.) The ALJ also considered the opinions of the state agency consultants and found them to be partially persuasive. (Id.) The ALJ reasoned that the record supported the findings of some moderate mental functioning limitations but overall improvement and stability in Kantner's symptoms and mental health treatment. (Id.) However, the ALJ limited Kantner to no interaction with the public due to his pedophilic disorder. (Id.)

The ALJ considered the third-party function report given by the claimant's father. (Id.) This report noted that Kantner spent much of his day laying down with no energy to do anything. (Id.) Kantner's father reported that Kantner had difficulty with concentration and memory, but that he was able to prepare meals and help with chores around the house. (Id.) The ALJ found this report unpersuasive, noting that the report contradicted the medical records, which did not support the limitations as alleged by Kantner's father. (Id.)

The ALJ also considered Kantner's testimony. Kantner testified that he lived with his father, and he was able to do some chores around the house and keep his personal hygiene. (Tr. 17). He stated that his hobbies included watching television,

13

reading the Bible, and going for walks. (Id.) He further testified that he experienced sleep disturbances, headaches, and drowsiness, and that he could not work because he had low energy and was not motivated. (Id.) He noted that he had continuing hallucinations and paranoia, and that he had problems remembering things. (Id.) The ALJ ultimately found that Kantner's statements were not consistent with the medical evidence of record. (Id.)

Having arrived at this RFC assessment, the ALJ found at Step 4 that Kantner was unable to return to his past relevant work. (Tr. 20). The ALJ then made a finding at Step 5 that Kantner could perform work available in the national economy as a machine feeder, press feeder, and machine tender. (Tr. 21). Accordingly, the ALJ concluded that Kantner did not meet the stringent standard for disability set by the Act and denied his claim. (Tr. 22). Kantner filed a request for review on September 17, 2020. (Tr. 159-61). The Appeals Council denied this request.  (Tr. 1-6).

This appeal followed. (Doc. 1). On appeal, Kantner contends that the ALJ erred in several respects when denying his disability claim. Thus, Kantner argues that the ALJ erred in his RFC assessment, failed to consider Kantner's paranoia and suicidal ideation to be severe impairments, and failed to fully develop the record. (Doc. 12). This case is fully briefed and is, therefore, ripe for resolution. For the

reasons set forth below, we find that substantial evidence supports the ALJ's decision in this case. Accordingly, we will affirm the decision of the Commissioner.

**III.   Discussion**

   **A.      Substantial Evidence Review – the Role of this Court**

   When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application

16

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

17

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

### C. <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence</u>

The plaintiff filed this disability application in April of 2019 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.

23

According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." <u>Id</u>. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(2), 416.920c(c)(2).

24

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

## D.   The ALJ's Decision was Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial

evidence supported the decision by the ALJ that Kantner was not disabled. Therefore, we will affirm this decision.

Kantner challenges the ALJ's RFC determination, arguing that the ALJ improperly found the state agency opinions partially persuasive. He also contends that the ALJ failed to find that his paranoia and suicidal ideations were severe impairments. Finally, he argues that the ALJ failed to fully develop the record when he did not order a mental consultative examination. However, we find that the ALJ adequately explained the persuasiveness afforded to the various medical opinions in the record and explained how those opinions factored into his RFC determination in light of the objective medical evidence.

At the outset, we note that the question of disability is a legal determination and is not wholly dictated by medical opinions. Indeed, it is well settled that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that

27

"the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

Here, the ALJ explained that he found the opinions of the consultative examiners to be partially persuasive because their findings of moderate limitations were generally consistent with objective medical record. Indeed, these consultative examiners found that Kantner was moderately limited in his ability to maintain attention and concentration for extended periods; complete a normal work week without interruptions from psychological symptoms; interact with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently. The ALJ reasoned that these opinions were consistent with the record which largely showed that Kantner had good concentration and memory, no psychotic thought processes, was oriented to person, place, and time, and was able to perform activities of daily living on his own. The ALJ further explained that CRNP Patterson's opinion was unpersuasive because it opined on the ultimate issue of disability, a legal determination that is for the ALJ to make, not a treating source.

The ALJ also considered Kantner's testimony but concluded that his subjective complaints were not consistent with the medical record. On this score, Kantner testified that he experienced sleep disturbances, headaches, and drowsiness,

and that he could not work because he had low energy and was not motivated. He further testified that he had continuing hallucinations and paranoia, and that he had problems remembering things. However, as the ALJ noted, the medical records indicated that by 2020, Kantner was not experiencing hallucinations or paranoia, nor was he experiencing suicidal or homicidal ideations. The medical records also indicated that on mental status evaluation, Kantner was found to have good concentration and memory.

On this score, the ALJ was confronted by several medical opinions, which including varying limitations based on the plaintiff's mental impairments. The ALJ considered all of these opinions against the objective medical evidence in the record and explained why he found certain opinions partially persuasive and why he found other opinions to be inconsistent with the medical evidence. The ALJ further considered the plaintiff's subjective complaints against the objective medical evidence and concluded that the evidence was not consistent with Kantner's alleged level of limitation. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Accordingly, we find that the ALJ considered all of the medical evidence and the plaintiff's subjective complaints and

adequately explained his reasoning for the persuasiveness afforded to the various medical opinions in this case to determine the range of work Kantner could perform.

Kantner also argues that the ALJ failed to consider his paranoia and suicidal ideations as severe impairments. At Step 2 of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). An impairment is severe if it is "something beyond 'a slight abnormality which would have no more than a minimal effect on an individual's ability to work.'" McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the step-two inquiry is a *de minimis* screening device used to cast out meritless claims. McCrea, 370 F.3d at 360; Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). The burden is on the claimant to show that an impairment qualifies as severe. Bowen, 482 U.S. at 146; Stancavage v. Saul, 469 F.Supp.3d 311, 331 (M.D. Pa. 2020).

In the instant case, Kantner argues that his paranoia and suicidal ideation should have been considered severe impairments, citing his instances of inpatient

hospitalization in 2016 and arguing that his hallucinations and paranoia affect his ability to leave the house. (Doc. 12, at 17). He contends that the ALJ did not discuss these impairments, and thus, a remand is required. We disagree.

While the ALJ did not discuss Kantner's history of suicidal ideation and paranoia in the Step 2 analysis of Kantner's severe impairments, these impairments and their effects on Kantner's ability to work were discussed throughout the opinion. On this score, the ALJ noted that while Kantner testified he continued to have hallucinations and paranoia, his medical records indicated that he had not experienced these symptoms following his release from prison in 2017 and later. Rather, the records showed that Kantner was able to leave the house to shop at stores and go to dinner with family. The ALJ also noted that Kantner himself testified that he no longer had suicidal thoughts. Accordingly, because it is the plaintiff's burden to prove that an impairment is severe, and because the ALJ explained that the medical evidence did not support a finding that these limitations affected Kantner's ability to work or function, we conclude that the ALJ's decision on this score was supported by substantial evidence.

Furthermore,

> [E]ven if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps

31

three through five. However, where it appears that the
ALJ's error at step two also influenced the ALJ's RFC
analysis, the reviewing court may remand the matter to the
Commissioner for further consideration. See Nosse v.
Astrue, No. 08No. 08–[CV–1173, 2009 WL 2986612,
*10] (W.D. Pa. Sept. 17, 2009).

McClease v. Comm. of Soc. Sec., No. 8–CV–1673, 2009 WL 3497775,
*10 (E.D. Pa. Oct. 28, 2009); see also Salles v. Comm. of Soc. Sec.,
229 F.Appx. 140, 145, n. 2 (3d Cir. 2007) (citing Rutherford v.
Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)) ("Because the ALJ found
in Salles's favor at Step Two, even if he had erroneously concluded that
some of her impairments were non-severe, any error was harmless.").

Brought v. Berryhill, No. 3:18-CV-788, 2019 WL 2487496, at *9 (M.D. Pa. Apr.

22, 2019), report and recommendation adopted, No. 3:18CV788, 2019 WL 2472711

(M.D. Pa. June 13, 2019). Here, even if the ALJ erred in not giving Kantner's

paranoia and past suicidal ideation more thorough treatment at Stage 2, that error

was harmless given the careful analysis of all of Kantner's mental impairments

throughout the subsequent steps in this sequential analysis. Thus, there was no

prejudicial error here.

Finally, Kantner argues that the ALJ should have ordered a consultative

mental examination to further develop the record. At the outset, it is well settled that

under the Social Security Regulations, an ALJ "'may decide to purchase a

consultative examination' where 'there is an indication of a change in a [claimant's]

condition that is likely to affect [claimant's] ability to work.'" Rosa v. Colvin, 956

F.Supp.2d 617, 622 (E.D. Pa. 2013) (quoting 20 C.F.R. § 404.1519a) (emphasis added). Indeed, the Court of Appeals has stated that an "ALJs duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability determination." Thompson v. Halter, 45 F. App'x 146, 149 (3d Cir. 2002); see also Mruk v. Colvin, 2014 WL 3881976, at *7 (M.D. Pa. Aug. 7, 2014).

Initially, we note that the plaintiff's brief only broadly challenges the ALJ's decision not to order a consultative examination and does not point to any specific ambiguities between the RFC assessment and the medical record used to make that assessment. However, as we have explained, the ALJ was not required to order a consultative examination. Rather, the ALJ may order an examination if there are ambiguities in the record regarding the plaintiff's functional abilities. In the instant case, the ALJ limited Kantner to a full range of work with certain nonexertional limitations to account for limitations he suffers because of his mental impairments. These limitations included performing simple, routine, repetitive tasks with few if any workplace changes, no interaction with the public, and only occasional supervision. This RFC assessment was based on the medical record as a whole in addition to the opinions of the consultative examiners. As we have acknowledged, the medical records showed that while Kantner continued to suffer from depression,

he was able to perform household chores, shop at stores, and care for himself. Additionally, his symptoms from his mental impairments were well controlled with medication, as the medical records indicated improvement with medication, and that Kantner generally had normal thought processes, no suicidal ideation or hallucinations, and good memory and concentration. Accordingly, because the ALJ formulated this RFC determination based on the entire medical record, and Kantner has not pointed to any ambiguities between the RFC assessment and the medical evidence, we find that the ALJ's limitations within the RFC determination are supported by substantial evidence, and thus, the ALJ did not err by failing to order a consultative examination.

We are also constrained to note that Kantner's medical providers continuously encouraged him to seek employment during the alleged period of disability. Indeed, treatment notes indicated that Kantner was encouraged to look for employment in a factory or warehouse setting due to the fact that he was not permitted to have contact with children. In addition, several treatment notes showed that Kantner was, in fact, actively applying for jobs, but that he was being denied employment because of his criminal history. Further, it was noted that Kantner's father was pushing for him to be on disability, and that Kantner's providers encouraged Kantner to continue to apply for employment and for Kantner's father to allow him to work on his issues.

Thus, it appears that Kantner was actively seeking employment opportunities while he is alleged to have been disabled, and he was denied these opportunities not because of a disability, but because of his criminal history.

Accordingly, on the facts as outlined above, the ALJ found that Kantner had not met the stringent standard for disability set by law. It is the right and responsibility of the ALJ to make such assessments and we find that substantial evidence supported the ALJ's decision in the instant case. Thus, at bottom, it appears that Kantner is requesting that this Court re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). Because we cannot re-weigh the evidence, and because we find that the ALJ properly articulated that substantial evidence did not support this disability claim, we will affirm the ALJ's decision in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this

ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

Submitted this  25th day of April, 2022.


<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge